**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

COLIN DILBERT

        Plaintiff,

   v.

                           CIVIL NO. 2:22-CV-5455

UNITED AIRLINES, INC.

        Defendant.

## COMPLAINT

Plaintiff Colin Dilbert states his causes of action against defendant United Airlines, Inc. as follows:

### THE PARTIES

1.    Plaintiff is Colin Dilbert.  Mr. Dilbert is 47 years old.  He is a Louisiana citizen.  He resides in Baton Rouge in East Baton Rouge parish.

2.    Defendant is United Airlines, Inc. ("**United**").  United is a foreign corporation incorporated in Delaware and headquartered in Chicago, Illinois.  United is registered with the Louisiana Secretary of State, actively does business in Louisiana, and employs many Louisiana citizens.  At the time this lawsuit was filed, United's registered agent for the service of process was CT Corporation System.

### JURISDICTION AND VENUE

6.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2000e-2 *et seq.* (Title VII) as more particularly set-out herein.

7.    The Court has supplemental, subject-matter jurisdiction over Mr. Dilbert's state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to his federal law claims that they form part of the same case or controversy as more particularly set-out herein.

8.    The Court has personal jurisdiction over United because it is a corporation registered and actively doing business in Louisiana and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

9.    Alternatively, the Court has personal jurisdiction over United because, upon information and belief, it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed unlawful employment acts within Louisiana giving rise to the causes of action in this case, and derives substantial revenue from the services it provides in Louisiana. Thus, United has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

10.    Venue for Mr. Dilbert's Title VII claims is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) because (1) the unlawful employment practice alleged herein was committed within this judicial forum (specifically, Jefferson parish), (2) upon information and belief the employment records relevant to this action are found in this judicial district (specifically, Jefferson parish), and (3) but for the unlawful employment practice, Mr. Dilbert would have been employed in this district (specifically, Jefferson parish).

11.    Venue for Mr. Dilbert's remaining federal and state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful conduct alleged occurred in this judicial forum (Jefferson parish) and Mr. Dilbert suffered his injuries and damages in this judicial forum (Jefferson parish).

## PROCEDURAL AND STATUTORY REQUIREMENTS

12.    United hired Mr. Dilbert as its employee in August 2014.

13.    United terminated Mr. Dilbert's employment on November 2, 2021.

14.     United employed more than 500 employees every week of both 2020 and 2021.

15.     On March 16, 2022, within 300 days of his unlawful termination, Mr. Dilbert through his attorney timely filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office alleging United unlawfully terminated Mr. Dilbert's employment based on his religion in violation of Title VII (EEOC Charge No. 440-2022-04509).

16.     On September 30, 2022, the EEOC issued Mr. Dilbert a Notice of Right to Sue in this matter.

17.     Mr. Dilbert timely filed this federal lawsuit within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.     The Plaintiff – Colin Dilbert**

18.     Colin Dilbert is a 47-year-old man who lives in Baton Rouge.

19.     Mr. Dilbert has spent his entire career working in the aviation industry as an aircraft mechanic.  Mr. Dilbert relies on his mechanic's work to support himself.

20.     Mr. Dilbert is Christian and adheres to what he describes as a protestant religious worldview.

**B.     The Defendant – United Airlines, Inc.**

21.     United Airlines, Inc. ("United") is a major American airline headquartered in Chicago, Illinois.  United specializes in domestic and international passenger air travel.

22.     United Airlines employed Mr. Dilbert from 2014 until it terminated his employment on November 2, 2021.

23.     United employed Mr. Dilbert as an Aircraft Maintenance Tech (an "AMT") assigned to Louis Armstrong New Orleans International Airport (MSY).

24.     As an AMT, Mr. Dilbert was responsible for ensuring United aircraft were in good working condition.

25.     As an AMT, Mr. Dilbert performed most of his work outside.  His essential job responsibilities did not usually require him to interact with employees or other people closer than 6 feet away.

**C.    United's Response to COVID-19 Prior to the Availability of Vaccinations**

26.     The respiratory disease known as COVID-19 is caused by the Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2") and its many variants.

27.     The U.S. Centers for Disease Control ("CDC") reported the first laboratory-confirmed case of COVID-19 in the United States on January 20, 2020.

28.     By the week of August 12, 2020, the CDC reported a total of slightly more than 5 million confirmed cases of COVID-19 nationwide.

29.     During this time, before any COVID-19 vaccine became available, United continued to do business and required Mr. Dilbert to come to work and do his job.

30.     United implemented several workplace precautions that were safe enough to allow Mr. Dilbert and his colleagues to continue coming to work without unreasonable risk of infection.

31.     Among those precautions at Mr. Dilbert's worksite were social distancing from one another, symptom checks, and the use of face coverings.

32.     These precautions were evidently safe and adequate enough that Mr. Dilbert and his colleagues did not present a direct threat of infection to each other.

33.     Mr. Dilbert did come to work, did continue to do his job, and United did continue to make profits because of the labor of Mr. Dilbert and his colleagues.

**D.    United's Response to COVID-19 After the Availability of Vaccinations**

34.    Around December 11, 2020, the U.S. Food and Drug Administration issued an Emergency Use Authorization for the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer, Inc.

35.    United never required any of its passengers or customers to receive any COVID-19 vaccination, even though United's customers and passengers routinely interacted with United's employees both on and off airplanes.

36.    Around August 6, 2021, United enacted a new employment policy that required every employee based in the United States to receive any of the FDA-approved COVID-19 vaccinations unless the employee applied for and was granted by management an exemption based on religious objection or disability.

37.    Under United's COVID-19 policy, at least some employees granted an exemption were given reasonable accommodations including the requirement to wear face coverings and social distance.  At least some other employees were accommodated by transferring them to other positions.

38.    Otherwise, under United's COVID-19 policy, an employee who was granted a religious exemption would be placed on indefinite, unpaid leave until United ended the policy.  After United ended the policy, the employee would be permitted to return to work.

39.    In either event, it appears that United offered accommodation to every single employee whom United determined held a sincere religious objection to United's COVID-19 vaccination policy.

40.    Under United's COVID-19 policy, failure to receive vaccination or a religious exemption resulted in termination of employment.

41.     United management unilaterally determined whether an employee held a sincerely held religious belief or not.

42.     Further, to the best of Mr. Dilbert's recollection, United's policy or practice at the time was to require employees who claimed religious objection to United's COVID-19 policy to submit letters from those employees' faith leaders or other third-parties attesting to the individual employee's beliefs.

43.     United's religious-accommodation policy specifically stated "We may require a letter from your religious leader on their letterhead supporting your request for an accommodation pertaining to a religious belief."

**E.     United Rejects Mr. Dilbert's Request for Religious Accommodation**

44.     Around August 23, 2021, the FDA granted full approval to the first publicly available COVID-19 vaccination in the United States manufactured by Pfizer.

45.     Mr. Dilbert identifies as a Christian and adheres to what he describes as a protestant religious worldview.

46.     Mr. Dilbert's sincerely held religious belief is that good and evil exist, and he is spiritually obligated to do good, and spiritually prohibited from doing evil.

47.     Relevant to this case, Mr. Dilbert holds two, sincere religious beliefs that, at the time he was employed by United, prevented him from receiving any of the then-currently available COVID vaccines, and, therefore, conflicted with United's vaccination policy.

48.     First, Mr. Dilbert holds a sincere religious belief that the human body is spiritually sacred and designed to heal itself through natural interventions, and that compelled medical treatment is therefore spiritually evil.  Because Mr. Dilbert regarded United's vaccination policy as compelled medical treatment, Mr. Dilbert ranked the policy as spiritually evil, and Mr. Dilbert's religious

belief prohibited him from receiving any of the then-available COVID-19 vaccines.

49.    Second, Mr. Dilbert believes that all iterations of the then-available COVID-19 vaccines were spiritually evil because Mr. Dilbert determined each was derived, researched, or laboratory-tested using fetal cell lines, harvested from human biological material without consent.  Mr. Dilbert's religious belief is that receiving any of these vaccines is akin to participating in the sin of abortion.  Because Mr. Dilbert believes abortion in this context is evil, his religious belief prohibited him from receiving any of the then- available COVID-19 vaccines.

50.    United implemented an online portal for its employees to request a religious accommodation to its vaccination policy.

51.    Around August 19, 2021, Mr. Dilbert timely applied for a religious exemption using the online portal.

52.    Mr. Dilbert described the basic framework of his religious beliefs in his application.  He described that "I am a self practicing Protestant / Presbyterian with the belief of homeopathic medical treatment before anything."  Mr. Dilbert also described "I'm a self practicing Protestant. I believe I cannot take anything that has fetal tissue in it. Again I also believe in homeopathic medical treatment."

53.    Later, in September 2021, to best of his recollection, a United Human Resources agent contacted Mr. Dilbert and asked him to submit documentation from a faith leader or other third-party that could verify his religious beliefs.

54.    To the best of his recollection, United's Human Resources department did not ask any follow-up or clarifying questions about the nature of Mr. Dilbert's religious beliefs.  Instead, United only demanded Mr. Dilbert produce some sort of witness statement to attest to his stated religious beliefs.

55.     To the best of his recollection, Mr. Dilbert explained to the Human Resources agent that he did not belong to any organized congregation and so could not produce such a witness statement.

56.     In response, on September 20, 2021, United's "Employee Service Center" emailed Mr. Dilbert and informed him his request for religious accommodation was denied because, in context, he failed to produce the requested witness statement.

57.     The Email read, in part: "To further process your [accommodation] request, we asked for additional information.  Unfortunately, we did not receive any additional information from you.  As a result of your decision not to further participate in the RAP [reasonable accommodation process], we are closing your case.

58.     This is false.  The only "additional information" United requested was a witness statement attesting to Mr. Dilbert's stated religious beliefs.  Mr. Dilbert did not decide against participating in United's accommodation process.  Mr. Dilbert described he could not produce such a statement because his religious beliefs did not require him to practice his faith within an organized congregation.  United, through its employees, knew this at the time.  United's claim that Mr. Dilbert declined to participate in United's accommodation process is mere pretext to justify its discriminatory termination decision.

59.     United's email also indicated that Mr. Dilbert would be terminated if he did not provide proof of vaccination by September 27.

**F.     United Grants a Temporary Accommodation to All Employees then Revokes It**

60.     United was previously sued in federal district court based on objections from other employees to its vaccination rule.  *See Sambrano et al. v. United Airlines, Inc.*, 2022 WL 486610 (5th Cir. Apr. 27, 2022).

61.    Based on that litigation, on October 2, 2021, United temporarily suspended the termination of employees who had not received a COVID-19 vaccination.

62.    United implemented an accommodation that was apparently safe and effective at preventing the spread of COVID-19 in the workplace such that Mr. Dilbert and his colleagues could continue working without constituting a direct threat to each other.

63.    Specifically, United required all its unvaccinated employees to begin using N95 or KN95 facemasks.

64.    As reported by the American Medical Association, a properly fitted N95 facemask prevents penetration of an infectious dose of COVID-19 virus particles for hundreds of hours of use.[1]

65.    Also as reported by the AMA, an unfitted N95 mask protects against infection by another person also wearing an unfitted N95 mask for up to 25 hours of use.

66.    Mr. Dilbert complied with United's temporary accommodation and continued to work.

67.    The CDC reports that as of June 1, 2021 the COVID-19 "B.1.617.2 / 'Delta' variant" had become the "dominant variant in the U.S."[2]

68.    The CDC reports that as of July 30, 2021, "The early data showing high viral loads in people infected with the Delta variant of COVID-19 suggest a concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus to others."[3]

69.    *The Lancet* medical journal reported on October 29, 2021 that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently

---

[1] The American Medical Association publishes a recurring series called "What Doctors Wish Patients Knew." These facts were reported by the AMA in its June 24, 2022 edition entitled "What doctors wish patients knew about wearing N95 masks." A copy of the edition may be accessed here: https://www.ama-assn.org/delivering-care/public-health/what-doctors-wish-patients-knew-about-wearing-n95-masks

[2] The CDC publishes a "COVID-19 Timeline" on its website which includes these facts. The site may be accessed here: https://www.cdc.gov/museum/timeline/covid19.html

[3] *Id.* at https://www.cdc.gov/museum/timeline/covid19.html

transmit infection in household settings, including to fully vaccinated contacts."[4]

70.     Mr. Dilbert alleges that when adhering to reasonable precautions including the use of face coverings, periodic COVID-19 testing, and ordinary social distancing, he posed no greater risk of infection by COVID-19 or transmission of COVID-19 to others than his colleagues who had already received COVID-19 vaccinations.

71.     Mr. Dilbert alleges his adherence to these reasonable and ordinary precautions imposed zero burden, hardship, or risk of future burden or hardship on United, its business, and its employees.

72.     Mr. Dilbert alleges he was never a direct threat to himself or anyone else to contract or spread COVID-19 in the workplace.

73.     To the extent Mr. Dilbert posed any risk to spread COVID-19 in the workplace, at the time of his termination on November 2, 2021, Mr. Dilbert alleges he posed no greater risk than his colleagues who had already received COVID-19 vaccinations.

74.     As of the time he was terminated, Mr. Dilbert alleges United either believed that their unvaccinated employees posed no greater risk of infection or transmission of COVID-19 in the workplace than United's vaccinated employees, or United would have so believed had they undertaken any sort of reasonable, objective, inquiry into the matter.

**G.     United Terminated Mr. Dilbert**

75.     On October 28, 2021, United placed Mr. Dilbert on paid suspension pending a final, internal due process hearing because he had not received a COVID-19 vaccination and had not been given an exemption based on his religious objection.

---

[4] Anika Singanayagam, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study*, THE LANCET (Oct. 29, 2021).   A copy of the article may be accessed here: https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext

76.    On November 2, 2021, United terminated Mr. Dilbert's employment because he had not received a COVID-19 vaccination and had not been granted a religious accommodation.

**H.    United Allows All Unvaccinated Workers Who Had Been Given Religious Accommodations to Return to Work**

77.    On March 10, 2022, United announced all unvaccinated employees who had been given accommodations because of their religious objections or disability would be allowed to return to full-time work with full pay and benefits.

78.    Because United had fired Mr. Dilbert just four months prior, he was not eligible to return to work.

79.    United never offered Mr. Dilbert his job back.

**I.    United Was Deliberatively Biased Against Certain Religious Workers but not Others**

80.    On November 8, 2021, the United Stated District Court for the Northern District of Texas entered order and reasons after conducting an evidentiary hearing on October 13, 2021 – about three weeks before Mr. Dilbert was terminated.  In its order and reasons, the Texas federal court made several findings of fact relevant to this case:[5]

- As of October 2021, United indicated that 99% of its employees had received a COVID-19 vaccine.

- Of the remaining unvaccinated employees who applied for exemption and accommodation, United granted 80% of all employee requests for religious accommodation.

- United granted 63% of all employee requests for disability accommodation.

- United's Chief Executive Officer is Scott Kirby.

---

[5]  *Sambrano v. United Airlines, Inc.*, 570 F.Supp.3d 409, 420 (N.D. Tex. 2021), *reversed on other grounds*, 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022).

- During a COVID-19 related presentation Kirby expressed "skepticism and apparent disdain for any religiously-motivated exemption requests" by United's employees.

- During his talk, Kirby "warned 'any employee [who] all the sudden decided I'm really religious' would unequivocally be 'putting your job on the line. You'd better be very careful about that.'"

81.    The Texas federal court specifically noted that "United's subsequent actions in 'accommodating' these employees [by placing them on indefinite, unpaid leave] suggest that United's actions may not have been motivated by safety concerns. Instead, United's actions may be viewed as merely pretextual."[6]

82.    Based on the facts and circumstances of the case as Mr. Dilbert understands them, United was biased against its workers who held religious-based objections to United's vaccination policy because United's senior-most decisions makers, including Scott Kirby, were biased against religion and their employees who held religious beliefs.

83.    Based on the facts and circumstances of the case as Mr. Dilbert understands them, United was specifically biased against its workers who practiced their religion outside of organized congregations.

84.    Based on the facts and circumstances of the case as Mr. Dilbert understands them, United was specifically biased against its workers who held religious beliefs that United's senior-most decision makers, including Scott Kirby, regarded as unusual or outside the mainstream.

85.    Based on the facts and circumstances of the case as Mr. Dilbert understands them, United was biased against its workers who did not share the same religious beliefs of United's senior-most decision makers and executives.

---

[6] *Sambrano*, *supra*, 570 F.Supp.3d at 420.

86.    Based on the facts and circumstances of the case as Mr. Dilbert understands them, United's religious-accommodation policy was intentionally designed to discriminate against religious workers by designing a policy that made it unreasonably difficult to obtain an exemption in the first place by forcing the employee to obtain statements from faith leaders or others attesting to the individual employee's religious beliefs without any legitimate business purpose whatsoever.  In other words, the failure of any person of faith to obtain an attestation from a third-party in no way bears on whether the employee holds sincere religious beliefs that conflicted with United's COVID-19 vaccination policy.  United's policy purposefully enacted roadblocks specifically to give United pretext to deny employee requests for religious accommodation.

87.    Alternatively, even if United's policy of forcing employees to obtain such a statement had some facially neutral purpose, the policy disparately impacted United's employees like Mr. Dilbert who did not practice their religious beliefs within an organized congregation, and United's policy lacked any business necessity or relationship to their employees' work whatsoever.

88.    Mr. Dilbert alleges that United denied his request for religious accommodation because United discriminated against him based on his particular religious beliefs and practices.  Stated another way, if Mr. Dilbert adhered to religious beliefs or practices endorsed or accepted by United, then United would not have fired him.

89.    Alternatively, for these same reasons, United's termination decision was at least motivated by Mr. Dilbert's particular religious beliefs or practices.

90.    Additionally, Mr. Dilbert alleges that United's religious-accommodation process disparately impacted Mr. Dilbert based on his particular religious beliefs and practices as outlined above.

91.    Based on the facts and circumstances as Mr. Dilbert understands them, United's senior-

most decision makers, including Scott Kirby, maliciously discriminated against Mr. Dilbert and

his colleagues who held particular religious beliefs United did not approve of.  At the very least,

United, through its decision makers, showed a reckless indifference towards Mr. Dilbert and his

colleagues' federally protected rights against religious discrimination.

**J.    The Aftermath**

92.    Mr. Dilbert suffered unemployment, loss of his income, and loss of his fringe benefits

because of United's religious discrimination, failure to accommodate, and wrongful termination.

93.    Mr. Dilbert has suffered significant mental anguish and emotional distress because of

United's religious discrimination, failure to accommodate, and wrongful termination.

94.    Mr. Dilbert has suffered other compensatory and out-of-pocket damages because of

United's religious discrimination, failure to accommodate, and wrongful termination.

**CAUSES OF ACTION**

**A.    Wrongful Termination and Unlawful Disparate-Impact Discrimination Based on
Religion against United under Title VII**

95.    Mr. Dilbert states a cause of action for wrongful termination and unlawful disparate-impact

discrimination because of his religion against United under Title VII.

96.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not

discriminate against any "individual with respect to . . . terms, conditions, or privileges of

employment, because of such individual's . . . religion[.]" 42 U.S.C. §2000e-2(a)(1).  An employer

discriminates because of an employee's religion when the employer uses "a particular employment

practice that causes a disparate impact on the basis of . . . religion" unless the employer proves

"the challenged practice is job related for the position in question and consistent with business

necessity[.]"

97.    Proof of discrimination intent is not required in a disparate-impact case.  *Munoz v. Orr*,

14

200 F.3d 291, 299-300 (5th Cir. 2000).  Instead, a plaintiff prevails by proving "facially neutral employment practices . . . create[d] such statistical disparities disadvantaging members of a protected group that they [were] 'functionally equivalent to intentional discrimination.'"  *Id.*

98.     An employer who discriminates against an employee in violation of Title VII is liable for the employee's lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

99.     Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

100.    United enacted a COVID-19 vaccination policy for its employees.  United permitted employees who held religious objections to the policy to apply for religious exemption. Employees who were granted an exemption were either given accommodations permitting them to continue working with pay, or, at the very least, United placed the employee on indefinite, unpaid leave and then returned the employee back to work in March 2022.

100.    For purposes here, Mr. Dilbert alleges that the reasonable accommodation owed to him would have been to continue working while observing the same or even greater safety precautions that United had already imposed on him and all other employees, including the use of approved face coverings, periodic COVID-19 testing at Mr. Dilbert's own expense, symptom checks, and social distancing where appropriate.  Alternatively, Mr. Dilbert alleges he would have at least been owed the accommodation of unpaid leave and then returned to work in March 2022.

101.    As of October 2021, United had approved 80% of all religious-objection requests. Nevertheless, United, either by the terms of its policy or as a matter of practice, required Mr. Dilbert and his colleagues to submit statements from faith leaders or other third-parties who could attest to the individual employee's religious beliefs.  Assuming for the sake of argument that United's policy or practice was facially neutral rather than purposefully discriminatory, this

requirement disparately impacted employees like Mr. Dilbert who did not practice their religious beliefs within an organized congregation.  United had no business need for such a requirement, nor was the requirement rationally or otherwise related to United's employees' work.  Thus, even though Mr. Dilbert holds sincerely held religious beliefs (as described throughout this lawsuit) that conflicted with United's COVID-19 vaccination policy, United's accommodation policy made it impossible for Mr. Dilbert to obtain accommodation because his particular beliefs and practices were disparately impacted.

102.    Accordingly, United owes Mr. Dilbert all damages arising from its disparately impacting policy, including Mr. Dilbert lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

**B.     Wrongful Termination and Unlawful Disparate-Treatment Discrimination Based on Religion against United under Title VII**

103.    Mr. Dilbert states a cause of action for wrongful termination and unlawful disparate-treatment discrimination based on his religion against United under Title VII.

104.    Under Title VII, an employer illegally discriminates against and terminates an employee when the decision is "because of" the worker's religion.  42 U.S.C. §2000e-2(a)(1).  An employer also illegally terminates an employee when the decision is "was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m); *accord Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (so holding). In a Title VII disparate-treatment action, an employer is vicariously liable for its decision-maker's discriminatory acts when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

105.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

106.    United's chief executive officer, Scott Kirby, has previously made comments that the Texas federal district court in the *Sambrano* matter found evinced "skepticism and apparent disdain for any religiously-motivated exemption requests" by United's employees.   Kirby previously said "any employee [who] all the sudden decided I'm really religious" would be "putting your job on the line.   You'd better be very careful about that."

107.    United's religious-accommodation policy purported to grant some sort of accommodation to every United employee whom management determined held a sincere religious objection to United's COVID-19 vaccination policy.

108.    For purposes here, Mr. Dilbert alleges that the reasonable accommodation owed to him would have been to continue working while observing the same or even greater safety precautions that United had already imposed on him and all other employees, including the use of approved face coverings, periodic COVID-19 testing at Mr. Dilbert's own expense, symptom checks, and social distancing where appropriate.   Alternatively, Mr. Dilbert alleges he would have at least been owed the accommodation of unpaid leave and then returned to work in March 2022.

109.    Nevertheless, United previously admitted that in October 2021, shortly before it terminated Mr. Dilbert's employment, United management had denied approximately 20% of its employees' requests for exemption.   The basis of United's rejections appears to be management's determination that the proffered reasons of some of its employee's religious objections were not "religious" or "sincere" enough to warrant protection.   But this reasoning appears pretextual because United had no reasonable or factual basis to form such a conclusion regarding Mr. Dilbert's beliefs given that United never actually questioned Mr. Dilbert about the matter before terminating him, instead only demanding he produce a letter from a faith leader or other third-

party attesting to Mr. Dilbert's beliefs. The allegation of United's pretext is bolstered given that management terminated Mr. Dilbert for his failure to produce such a letter even after Mr. Dilbert explained the factual reasons why he could not do so.

110.    Moreover, in the Fifth Circuit, "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 486 (5th Cir. 2014) (citing *Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013)). Furthermore, an employee's willingness to be fired from his job to preserve his religious beliefs and practices – like Mr. Dilbert in this case – is direct evidence that the employee's religious beliefs are sincerely held. *Tagore*, 735 F.3d at 329 ("Tagore was willing to sacrifice her government employment for the sake of wearing a religiously significant symbolic kirpan . . . [and] create[s] a genuine issue of material fact as to her sincere belief in wearing a 3-inch bladed kirpan"). United's decision to terminate Mr. Dilbert's employment based on management's determination that his beliefs were not religious or sincere enough appears even more pretextual given that, here in the Fifth Circuit, United's determination appears illegal on its face.

111.    Combined with Kirby's previous comments evincing animus towards religion and United's religious employees, Mr. Dilbert asserts the real reason why United denied his request for accommodation is because United's management holds animus against its religious employees generally, and specifically against employees like Mr. Dilbert who adhere to religious beliefs and practices that management regards as non-mainstream, individualized, or different than the religious or secular beliefs held by United management.

112.    In the alternative, Mr. Dilbert alleges that, for these same reasons, United's termination decision was at least motivated by animus for Mr. Dilbert's religious beliefs and practices.

113.    Additionally, Mr. Dilbert asserts that United's policy or practice requiring employees to obtain statements from faith leaders or third-parties attesting to their religious beliefs was not facially neutral but was disparately treating on its face.  In other words, Mr. Dilbert alleges that United's policy or custom was merely enacted as an artificial roadblock to make qualifying for an accommodation more difficult to give United pretext for firing its religious employees, either because of United's animus towards religion, or at least motivated by that animus.

114.    Accordingly, United owes Mr. Dilbert all damages arising from its disparately impacting policy, including Mr. Dilbert lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

## C.    Wrongful Termination and Failure to Reasonably Accommodate Religious Objection against United under Title VII

115.    Mr. Dilbert states a cause of action for wrongful termination and failure to reasonably accommodate his religious objection against United under Title VII.[7]

116.    Title VII makes it "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977).  A plaintiff proves a prima facie case for failure-to-accommodate discrimination by showing "(1) that he had a bona fide religious belief that conflicted with an employment requirement; (2) that he informed the employer of his belief; and (3) that he was discharged for failing to comply with the conflicting employment requirement."  *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).  Once the plaintiff proves a prima facie case, "the burden shifts to the defendant to

---

[7]  The Supreme Court has held a failure-to-accommodate-religious-objection claim under Title VII is properly classified as a claim for disparate-treatment discrimination under 42 U.S.C. § 2000e-2.  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015).  Here, plaintiff presents the facts and law of his failure-to-accommodate claim separately from his disparate-treatment cause of action based on religious animus for sake of clarity.

demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.* Current decisional law holds a proposed accommodation is unreasonable "when an employer is required to bear more than a de minimis cost." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 487 (5th Cir. 2014); *accord Hardison*, 432 U.S. at 84.

117. Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

118. At the outset, Mr. Dilbert has proven his prima facie case for failure-to-accommodate discrimination. He held two sincere, religious beliefs that conflicted with United's COVID-19 vaccination policy (described throughout this lawsuit). Mr. Dilbert timely requested a reasonable accommodation based on his religious objection. United acknowledged receipt of the request. United fired Mr. Dilbert because he failed to comply with United's vaccination policy. United, in turn, failed reasonably accommodate Mr. Dilbert's religious beliefs. United enacted a COVID-19 vaccination policy for its employees. United permitted employees who held religious objections to the policy to apply for religious exemption. Employees who were granted an exemption were either given accommodations permitting them to continue working with pay, or, at the very least, United placed the employee on indefinite, unpaid leave and then returned the employee back to work in March 2022.

119. For purposes here, Mr. Dilbert alleges that the reasonable accommodation owed to him would have been to continue working while observing the same or even greater safety precautions that United had already imposed on him and all other employees, including the use of approved face coverings, periodic COVID-19 testing at Mr. Dilbert's own expense, symptom checks, and social distancing where appropriate. This is especially true given that Mr. Dilbert's primary job responsibilities required him to work outside. In contrast, Mr. Dilbert alleges that United's

proposed "accommodation" of indefinite, unpaid leave constituted an involuntary layoff and termination and was no accommodation at all.

120.    More specifically, permitting Mr. Dilbert to continue working as United had already allowed him and apparently all its other employees to do before the first COVID-19 vaccines became available in the United States could not have constituted more than a de minimis cost on its face.  United had already made the determination that no direct threat was risked by requiring all its employees to continue working before the availability of COVID-19 vaccines.  United made the determination that no direct threat was risked by requiring all its unvaccinated employees to continue working during the *Sambrano* litigation.  United made the determination that its unvaccinated employees posed no risk to workplace safety at least by March 2022 when United permitted its entire unvaccinated workforce to return to work.  Even by the time United terminated Mr. Dilbert's employment on November 2, 2021, it appears that vaccinated employees posed the same or similar risk of transmitting COVID-19 in the workplace as their non-vaccinated peers given the prevalence of the delta (B.1.617.2) variant.  At the time, it was understood that employees who wore N95 face coverings did not pose a reasonable risk of infecting each other with COVID-19 in the workplace.  None of these already-in-use accommodations cost United anything.  None of these accommodations burdened United's business.  None of these accommodations posed a reasonable risk to workplace safety.  United simply refused to reasonably accommodate Mr. Dilbert because United did not want to, and because United unreasonably determined that Mr. Dilbert's religious beliefs were not "religious" or "sincere" enough to warrant protection.

121.    Alternatively, at the very least, Mr. Dilbert alleges he was at least owed the accommodation of unpaid leave and then returned to work in March 2022.

122.    Alternatively, Mr. Dilbert alleges that United could have reasonably accommodated him

in some other way, and it remains United's burden of persuasion, akin to an affirmative defense, to prove otherwise during the case.

123.    Accordingly, United owes Mr. Dilbert all damages arising from failure to reasonably accommodate his religious beliefs and practices, including Mr. Dilbert lost back wages, lost future wages or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs incurred in the matter.

124.    Finally, in the alternative, if the Court were to find that a proposed accommodation that would have permitted Mr. Dilbert to continue working at United was nevertheless "unreasonable" because it imposed something more than "de minimis" burden on United, Mr. Dilbert alleges the proper standard to evaluate a reasonable accommodation claim in a Title VII religious objection case is akin to the standard currently applicable in disability claims under the ADAAA – that is to say, an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause the employer significant difficulty or expense. *See* 29 C.F.R. § 1630.2.  Plaintiff alleges the "de minimus" standard currently applicable to Title VII religious objection cases is inconsistent with the statutory text of 42 U.S.C. § 2000e(j) and its meaning and should be overturned.  Plaintiff likewise alternatively alleges that United was obligated to extend to Mr. Dilbert any reasonable accommodation from its COVID-19 vaccination policy on account of his religious objection that it afforded to any other employee for any other reason. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) ("But Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices.  Rather, it gives them favored treatment . . . Title VII requires otherwise-neutral policies to give way to the need for an accommodation").

**D.    Wrongful Termination and Unlawful Discrimination because of Religion against United under the LEDL**

125.    Mr. Dilbert states a cause of action for wrongful termination and unlawful discrimination because of religion against United under the Louisiana Employment Discrimination Law, codified at La. Rev. Stat. Ann. § 23:301 *et seq.*

126.    Under the LEDL, no employer may discriminate against an employee based on his religion. La. Rev. Stat. Ann. § 23:332(A)(1). LEDL discrimination claims are analyzed under the analogous Title VII standard. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

127.    Plaintiff incorporates by reference here all the factual allegations alleged in this lawsuit.

128.    Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims for disparate-impact, disparate-treatment, and failure-to-accommodate discrimination based on religion under Title VII, United is liable to Mr. Dilbert for all his damages arising from United's unlawful discrimination, including lost back wages, lost future wages or reinstatement, compensatory damages, and reasonable attorney's fees and costs incurred in this matter.

### RESERVATION OF AMENDMENT

Ms. Majorie reserves the right to amend this lawsuit as circumstances warrant.

### JURY DEMAND

Ms. Majorie requests a trial by jury on all issues and causes of action triable by jury.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Colin Dilbert prays that this complaint be deemed good and sufficient; that it and summons be served on defendant United Airlines, Inc.; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant providing for the following relief, remedies, and damages as appropriate:

1.     Under Title VII and the LEDL, the entry of a declaratory judgment in favor of Mr. Dilbert and against United declaring that the practices complained of in this complaint are unlawful under federal and state law and that United willfully, maliciously, or recklessly as the case may be violated the rights of Mr. Dilbert as alleged and proven.

2.     Under Title VII, awarding Mr. Dilbert all damages and equitable relief due against United, including but not limited to back pay, front pay or reinstatement, compensatory damages, punitive damages, and reasonable attorney's fees and costs.

3.     Under the LEDL, awarding Mr. Dilbert all damages and equitable relief due against United, including but not limited to back pay, front pay or reinstatement, compensatory damages, and reasonable attorney's fees and costs.

4.     Under Title VII and the LEDL, awarding all other legal or equitable relief to which plaintiff is due, including but not limited to an injunction against United forbidding them to require employees who submit religious objections to United employment policies to submit statements from faith leaders or other third-parties attesting to the individual employee's religious beliefs.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone: (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Colin Dilbert*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**COLIN DILBERT**

   **Plaintiff,**

  **v.**

**UNITED AIRLINES, INC.**

   **Defendant.**

    **CIVIL NO. PENDING**

## DECLARATION OF COLIN DILBERT

I, Colin Dilbert, am 47 years old, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following facts and true and correct to the best of my knowledge and recollection:

1. I am the named plaintiff in the lawsuit *Colin Dilbert v. United Airlines, Inc.*, soon to be filed in the United States District Court for the Eastern District of Louisiana.

2. After reviewing the entire document, I authorized and instructed my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter and to assert all of the causes of action included therein.

3. I verify that, at the time of its filing, each of the factual allegations of the Complaint was true and correct to the best of my knowledge and recollection.

  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.  Executed on ____12/26/2022____

      DocuSigned by:

      7B8F78E1559A42B...

      Colin Dilbert